In re Robert H. BRANCHAUD, Debtor.

Charles A. LOVELL, Esq., Disbursing Agent for Robert H. Branchaud, d/b/a B & G Associates, Plaintiff,

v.

KEVIN J. THORNTON ENTERPRISES, INC., d/b/a Rick's Warehouse Liquors, Ltd., Defendant.

Bankruptcy No. 89–10605.
Adv. No. 94–1227.

United States Bankruptcy Court,
D. Rhode Island.

Sept. 18, 1995.

Christine M. Curley, Partridge, Snow & Hahn, Providence, RI, for plaintiff.

Gerard R. Laliberte, Woonsocket, RI, for defendant.

DECISION AND ORDER ON PLAIN-
TIFF—DISBURSING AGENT'S COM-
PLAINT SEEKING RECOVERY OF
UNPAID RENT, ETC.

ARTHUR N. VOTOLATO, Bankruptcy
Judge.

Heard on the Complaint of Charles Lovell, Esq., the disbursing agent appointed under the Debtor's confirmed plan of reorganization, seeking recovery of unpaid rent, oil consumption charges, and taxes from the Defendant, Kevin J. Thornton Enterprises, Inc., d/b/a Rick's Warehouse Liquors, Ltd. ("Thornton"). The Disbursing Agent also requests attorney's fees, costs, and interest.

Based on the record and the arguments, for the reasons stated below we rule that the Disbursing Agent is entitled to relief in accordance with the following discussion, findings and conclusions.

## BACKGROUND

On August 15, 1982, Robert Branchaud, d/b/a/ B & G Associates, entered into an eight year lease with Rick's Warehouse Liquors, Ltd., of property located at 202–204 South Main Street, Woonsocket, Rhode Island. Under the terms of the agreement, the lessee was required to pay a minimum monthly rent of $1,666, with annual increases tied to the Boston Consumer Price Index. (Plaintiff's Ex. # 1, at 1–2). Additionally, the lessee was required to pay its pro-rata share (five-sevenths) of any increase in real estate taxes from the base year, and oil consumption charges. The lease contained options to renew for three additional periods of five years each. (Id. at 2–3, 6). On September 22, 1988, the lease was assigned to Thornton, the Defendant herein. (Plaintiff's Ex. # 2). On January 5, 1989, Thornton exercised its option to extend the lease for an additional five years, through August 15, 1995. (Plaintiff's Ex. # 3).

On July 10, 1989, Robert Branchaud and five of his related entities filed petitions for relief under Chapter 11, and on July 24, 1989, these cases were consolidated administratively. On February 21, 1991, the Debtors' Seconded Amended Plan of Reorganization was confirmed and Lovell was appointed disbursing agent. As such, he received title to the subject real estate, to administer for the benefit of creditors. In May 1991 Mr. Lovell informed the tenants of his appointment as disbursing agent, and began collecting rent.[1]

On August 20, 1993, Mr. Lovell sent Thornton a letter formally notifying him that rental increases since September 1990 were due in the amount of $3,936. (Plaintiff's Ex. # 7). Thornton had not received a formal notice of rent increase since October 17, 1989, when Robert Branchaud increased the rent to $2,523.05 per month for the period September 1989 to September 1990. (Plaintiff's Ex. # 5). On September 8, 1993, Thornton responded to Lovell's demand, by advising that he recalculated all rent increases and payments since September 1983, and discovered errors that resulted in overpayments totaling $6,287. (Plaintiff's Ex. # 8).

## THE ISSUES

Lovell alleges that: (1) Thornton has failed to pay rent increases called for under the lease since September 1990, amounting to $13,560; (2) Thornton owes $29,539, because it has failed to pay any rent since October 1994; (3) Thornton owes rent through August 1995, notwithstanding its abandonment of the premises; and (4) Thornton has failed to pay its pro-rata share of increased taxes and oil charges, in the amount of $2,725.

Thornton does not dispute that it owes the taxes and oil charges claimed, but argues that it (1) was constructively evicted by Lovell's failure/refusal to provide lessor services, and (2) asserts a $5,700 offset resulting from the lessor's miscalculation of the annual rent increase since the inception of the lease in 1982. We ruled at the May 9, 1995 hearing that Thornton could not go back to 1982

---

1. Under the Plan, the unexpired lease with Thornton was rejected. Thereafter, Thornton filed a motion to set aside the rejection, and requested an order compelling the Debtor to reaffirm the unexpired lease. By Consent Order dated November 18, 1991, the parties agreed that Thornton could remain in possession under the lease for its remaining term, including any extensions exercisable under non-bankruptcy law.

to recalculate past due rent.[2] Thornton also argues that the Disbursing Agent's acceptance of reduced rent payments since September 1990 constitutes payment in full, and that he is now equitably estopped from seeking past due rent.

## DISCUSSION

This dispute centers around Lovell's three year delay in formally notifying Thornton of annual rent increases allegedly due under the lease. Lovell denies that the delay was a result of neglect, but argues that even in the exercise of due diligence it took him until now to reach this matter, after tending to all of his other priority duties as disbursing agent. He submits that the five consolidated bankruptcies were very complex, involving over 200 creditors, that the rent increase provisions were clear, and that Thornton was on actual and constructive notice of the increases. Kevin Thornton, the president of the Defendant corporation, acknowledged that he was aware of the rent increase provisions, but in light of conversations with Lovell regarding the downturn in his business, he *assumed* that Lovell was accepting the reduced payments of $2,523 *in lieu of* the increased rent.

■ Both factually and legally this argument is without merit, and Thornton is bound by the terms of the lease as written. There is no evidence or writing to alter the terms of the original lease, Thornton's unilateral "assumptions" do not equate to an agreement between the parties, and they certainly are not binding on the Disbursing Agent. *See North Smithfield Volunteer Fire Dept. v. Kollet,* 70 R.I. 182, 38 A.2d 141 (1944) (Court found that an *oral agreement* did not alter terms of written lease). The lease provides that the "Lessee shall pay to the Lessor as a Minimum Annual Rent for each Lease year after the initial lease year (it being the intention of the Parties to calculate the Minimum Annual Rent for each such year separately), a sum calculated by...." (Plaintiff's Ex. # 1, at 2). Under the terms of the lease, rent increases are self-executing, and there is

no requirement that the lessor provide notice of such new amount to the lessee. Accordingly, we find that the Disbursing Agent did not waive the annual increases, nor has he engaged in any conduct that would cause him to be equitably estopped from enforcing the lease in any respect. Accordingly, we conclude that Thornton is liable under the lease for all past due rent increases, as calculated by the Disbursing Agent.

■ In support of his constructive eviction argument, Thornton complains that he encountered numerous maintenance problems with the subject property, that were not corrected by Lovell. For example: (1) the air conditioners did not work; (2) Lovell did not provide snow removal services for 1994 as required under the lease; (3) Lovell failed to replace light bulbs; (4) a garage door was left with inadequate temporary repairs after an attempted burglary; (5) the exterior was in need of painting; and (6) the roof and foundation leaked in 1994. Thornton admitted that he never alerted Lovell to some of these present complaints, because he "thought it would be fruitless" and that "communications had broken down." He also states that he only telephoned Lovell once in January 1994 about the leaking roof and foundation.

The evidence does not support Thornton's claim of constructive eviction. Paragraph 6(b) of the lease provides that the Lessor will:

> [m]aintain the interior of the building of which the demised premises are a part up to the point of the demised premises, and keep the exterior and structural portion of the demised premises, in good repair during the continuance of this lease. Lessor shall be liable only for such damage or loss to the leased premises or the property contained therein by reason of rain, snow or other causes resulting from the negligence of the Lessor or Lessor's failure to comply with the obligations of the lease only after due written notice of Lessor's

---

2. This ruling was based in part on the fact that Thornton was not even a lessee until September 1988 when the assignment of lease was executed,

which would have been the appropriate time to raise the issue.

failure or breach has been hand-delivered or sent by certified mail to Lessor....

(Plaintiff's Ex. # 1, p. 5). Lovell correctly points out that many of Thornton's complaints were not the lessor's responsibility, and also that Thornton failed to comply with any of the notice requirements under Paragraph 6(b). We agree with and adopt the position of the Disbursing Agent on this issue and reject Thornton's assertion of constructive eviction. Thornton is correct, however, that under Paragraph 6(a) of the lease Lovell was required to provide snow removal, which he concedes he failed to do. Accordingly, Thornton is entitled to an offset of $1,375, the amount paid for snow removal in 1994. (*See* Defendant's Ex. # C).[3]

■ Finally, we address Lovell's claim for rent through August 1995, the lease expiration date. There is no dispute that Thornton stopped paying rent in October 1994. There is some question, however, as to when Thornton actually vacated the premises, and when the property became available for the Debtor to obtain a new tenant. Lovell testified that he knew as early as August 1994 that Thornton was contemplating vacating the premises, and in November 1994, he changed the electrical service to his name and began receiving electric bills. Lovell argues that he did not know for certain that Thornton had vacated the property until January 1995, when he received the keys. Subsequently, he made a business decision not to encumber the property with a long term lease, because he was uncertain whether he would abandon the property or place it on the market for sale.

While we do not second-guess Lovell's business judgment not to re-let the premises, neither may we overlook his legal duty to mitigate damages, upon learning that Thornton had left the premises. "The doctrine of avoidable consequences states that a party may not recover damages 'that the injured party could have avoided without undue risk, burden or humiliation'.... This rule prevents parties from sitting idly by and permitting their damages to accumulate." *Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury*, 603 A.2d 726, 729 (R.I. 1992), quoting Restatement (Second) *Contracts* § 350(1) (1981). Considering that Lovell changed the electrical service to his name in November 1994, it is also reasonable to conclude that he should have marketed the property from that point, notwithstanding the fact that Thornton had not physically returned the key.[4] We also rule, for damage mitigation purposes, that Lovell was entitled to approximately ninety days within which to obtain a new tenant after December 1, 1994. Accordingly, we find that Thornton is responsible for (reasonable) rent for the period November 1, 1994 through February 1, 1995, at the rate of $2,900 per month, for a total of $8,700. Based upon the foregoing, we find and conclude that Thornton is indebted to the Disbursing Agent for rent, taxes, and oil charges in the total amount of $23,610.[5] In addition, the lease provides that the "Lessee agrees to pay on demand all attorney fees incurred by Lessor in enforcing Lessor's rights under this agreement." (Plaintiff's Ex. # 1, at 10). In accordance with this lease provision, the Disbursing Agent seeks attorney's fees and costs. We find that the request (Docket # 16) of $7,236 is reasonable, and it is allowed in that amount, plus costs of $411. The Plaintiff is also entitled to pre-judgment interest on the award, pursuant to the terms of the lease at 12% per annum. (*See* Plaintiff's Ex. # 1, at 4). Post-judgment interest will accrue at the federal rate until the judgment is paid. *See* 28 U.S.C. § 1961.

Enter Judgment consistent with this opinion.

---

3. Exhibit C also contains copies of two invoices from 1993 which have not been included in our offset calculation, because both Thornton and Lovell testified that the 1993 snow removal charges were paid by previous rent offsets.

4. Locks, of course, can be and are changed regularly.

5. $13,560 (unpaid rental increases) + $8,700 (unpaid rent) + $2,725 (oil & taxes) − $1,375 (1994 snow removal credit) = $23,610.